UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| VALERIE D. HUBBARD, | Case No. 3:12-cv-00681-MMD-VPC |
| Plaintiff, | ORDER |
| v. | |
| DAY & ZIMMERMANN HAWTHORNE CORPORATION, a foreign corporation, | |
| Defendant. | |

## I.   SUMMARY

Before the Court is Defendant Day & Zimmermann Hawthorne Corporation's Motion for Summary Judgment ("Motion"). (Dkt. no. 24.) The Court has reviewed Plaintiff's opposition (dkt. no. 25) and Defendant's reply (dkt. no. 26). For the reasons stated herein, the Motion is denied.

## II.   BACKGROUND

This dispute arises out of alleged employment discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 1210, *et seq.* The following facts are undisputed.[1]

Defendant operates the Hawthorne Army Depot ("the Depot"), a live munitions storage facility, pursuant to a contract with the United States Army. (Dkt. no. 24-2 at 2.)

---

[1]The facts are taken primarily from Plaintiff's deposition testimony (dkt. no. 24-4), and from the Complaint (dkt. no. 1) and certain exhibits attached to the parties' briefs that are not disputed.

For safety and security reasons, Defendant employs a full-time staff of security guards to protect the Depot at all times. (*Id.*; dkt. no. 24-4 at 7-8, 19.) Defendant's disciplinary policy calls for termination of those employees who are deemed to be a "no-call, no-show" (i.e., failure to report at their assigned work location and assigned time). (Dkt. no. 24-2 at 2; dkt. no. 24-4 at 10.) However, employees who are asked to report back to the Depot's clinic ("Clinic") due to medical concerns are given two chances to report to the Clinic before they are terminated. (Dkt. no. 24-2 at 2-3.) According to Defendant, it gives two opportunities because it "recognizes that an employee with medical concerns may have other matters on their mind." (*Id.*)

Plaintiff Valerie D. Hubbard was employed with Defendant as a security guard at the Depot from November 2008 to November 9, 2009.[2] (Dkt. no. 24-4 at 25, 64.) She worked the graveyard shift. (*Id.*) On June 16, 2009, Plaintiff had a hysterectomy to treat early stages of uterine cancer. (Dkt. no. 24-4 at 32-33.) Plaintiff requested and was given time off work before the surgery. (*Id.* at 29.) Her physician, Dr. Beckman, advised her that she would need to take hormone supplements for the rest of her life since there was a chance that she may experience emotional issues after the complete hysterectomy. (*Id.* at 34-35.) In her postoperative visit on August 11, 2009, Dr. Beckman noted that she had no complaints with her supplements. (Dkt. no. 24-7.) Plaintiff returned to work on August 12, 2009. (Dkt. no. 24-4 at 38-41.) She felt fine at that time and was able resume her regular job duties. (*Id.*)

About a month later, in September, Plaintiff started to experience emotional problems, including anger issues and difficulty with concentration. (Dkt. no. 24-4 at 4, 42-43.) She was concerned about her ability to perform her job safely given that her responsibilities involved providing security and she was provided with a firearm during her shift. (Dkt. no. 24-4 at 42-43.) Plaintiff's emotional health deteriorated such that on the evening of October 20, 2009, "it seemed like [she] broke," she "felt like [she] wanted

---

[2]Plaintiff had been previously employed with Defendant, but was terminated and then rehired in November 2008. (Dkt. no. 24-4 at 24.)

2

to commit suicide, and [she] did not know what was wrong with [her]." (*Id.* at 5, 44-45.) Plaintiff discussed her concerns with one of her supervisors, Richard Bryant, who referred her to human resources to explore her options, which she did. (Dkt. no. 24-4 at 47-52.)

The next morning, October 21, 2009, she saw Dr. Beckman and he suggested the emotional issues she was experiencing "were possibly" related to her menopausal status and her supplements. (*Id.* at 53; dkt. no. 24-7.) Dr. Beckman changed her medication and noted that he did not see any medical reason for her not to work. (Dkt. no. 24-7.)

After her appointment with Dr. Beckman, Mr. Bryant contacted her to relay that she should not come to work that evening but should report to the Clinic in the morning for a "Fitness for Duty" evaluation.[3] (*Id.* at 54.) Plaintiff agreed with Mr. Bryant's request since she did not believe she could do her job at that time because of her emotional state. (*Id.*)

On October 22, 2009, Plaintiff reported to the Clinic and was seen by the Clinic doctor. (*Id.* at 56-57.) Plaintiff gave the doctor the background information about her mental state and the change in her hormone supplements. (*Id.*) The doctor told her to take time off since he did not believe, based on his observation of her mental state at that time, she could perform her duties. (*Id.*) Plaintiff was given the Clinic service provider form ("First Notice") directing her to provide her doctor's note to the Clinic on or before October 26, 2009. (Dkt. no. 24-8.) The First Notice further stated that a release form would be sent to Dr. Beckman and Plaintiff would be "off work until further notice." ///

---

[3]According to Plaintiff, if a supervisor believed that an employee should be examined to determine whether the employee is fit for duty, the supervisor would send the employee to the clinic where a doctor, who is employed with Defendant as an independent contractor, would examine the employee to determine whether or not the employee is fit to work. (Dkt. no. 24-4 at 10-12.) Mr. Bryant completed a "Fitness for Duty" form on October 21, 2009, stating that Plaintiff relayed that "she was going to request a leave of absence due to a medical condition resulting from recent surgery, causing extreme mood swings, making it difficult for her to work." (Dkt. no. 25-1 at 53.)

(*Id.)* After leaving the Clinic on October 22, 2009, Plaintiff made an appointment to see Dr. Beckman on November 4, 2009. (Dkt. no. 24-4 at 60, 63.)

Plaintiff did not report to the clinic on October 26, 2009.[4] (Dkt. no. 24-4 at 60-62.) Defendant sent Plaintiff a second Clinic service provider form dated October 27, 2009 ("Second Notice") via certified mail, which she received at the end of October. (*Id.*; dkt. no. 24-9.) The Second Notice informed Plaintiff that she would need to provide her doctor's note to the clinic on or before November 3, 2009. (Dkt. no. 24-9.) It further indicated: "failed to check in with clinic on 10-26-09. Must check in by 11-3-09 with Dr. note." (*Id.)* Plaintiff contacted the Clinic the day she received the Second Notice. (Dkt. no. 24-4 at 61.) According to Plaintiff, she did not report to the Clinic by November 3, 2009, because the clinic administrator told her not to worry about the date. (*Id.* at 62; dkt. no. 25-1 at 19.)

At her scheduled appointment with Dr. Beckman on November 4, 2009, Plaintiff asked Dr. Beckman to release her to return to work. (Dkt. no. 25-1 at 23, 55.) By that time, Plaintiff was responding to the new medication and was "feeling a little better." (*Id.* at 23; dkt. no. 24-7 at 2.) Dr. Beckman released her to return to work starting on November 5, 2009. (Dkt. no. 25-1 at 23, 55.) Plaintiff contacted Defendant's clinic on the same day after her appointment with Dr. Beckman. (*Id.* at 23*.)* However, on November 9, 2009, Plaintiff was informed Defendant has terminated her employment for violating its "no-call, no-show" policy. (*Id.* at 24-25; dkt. no. 24-4 at 64.)

The Complaint asserts under the "first claim for relief' disability discrimination under the ADA based on Defendant's alleged failure to provide reasonable accommodation and termination of Plaintiff's employment "for exercising her rights

[4]Plaintiff testified that she was not given any paperwork on October 22, 2009 (dkt. no. 25-1 at 17), but it appears that she recanted during her deposition. Plaintiff later testified that she read the paperwork that the Clinic staff gave her on October 22, 2009, and her friend who accompanied her to the Clinic also read the paperwork. (Dkt. no. 24-4 at 59.) Plaintiff also acknowledged that she knew, based on past experience that if taken off work after a Fitness for Duty exam, the employee has to report back to the Clinic at some future date. (*Id.* at 59-60.)

1  under the Act and because of her disability." (Dkt. no. 1 at 3.) Defendant construes the

2  Complaint as alleging disability discrimination and seeks summary judgment on this

3  basis. Plaintiff's response contends that her Complaint also alleges retaliation.

4  **III.   LEGAL STANDARD**

5       The purpose of summary judgment is to avoid unnecessary trials when there is

6  no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

7  18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the

8  pleadings, the discovery and disclosure materials on file, and any affidavits "show there

9  is no genuine issue as to any material fact and that the movant is entitled to judgment

10 as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is

11 "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder

12 could find for the nonmoving party and a dispute is "material" if it could affect the

13 outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

14 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue,

15 however, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d

16 439, 441 (9th Cir. 1995). "The amount of evidence necessary to raise a genuine issue of

17 material fact is enough 'to require a jury or judge to resolve the parties' differing

18 versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir.

19 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In

20 evaluating a summary judgment motion, a court views all facts and draws all inferences

21 in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach &*

22 *Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

23       The moving party bears the burden of showing that there are no genuine issues

24 of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In

25 order to carry its burden of production, the moving party must either produce evidence

26 negating an essential element of the nonmoving party's claim or defense or show that

27 the nonmoving party does not have enough evidence of an essential element to carry its

28 ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson, 477 U.S. at 252.

## IV.    DISCUSSION

### A.    Disability Discrimination

Title I of the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and privileges of employment." 42 U.S.C. § 12112(a) (2009). To establish a prima facie case of discrimination under the ADA, a plaintiff must show that she "(1) is disabled; (2) is 'qualified' and (3) suffered an adverse employment action because of [her] disability." *Jefferson v. Time Warner Cable Enters. LLC*, 584 F.App'x. 520, 522 (9th Cir. 2014); *Allen v. Pac. Bell,* 348 F.3d 1113, 1114 (9th Cir. 2003). If a plaintiff satisfies her burden, the burden then shifts to the defendant to offer a legitimate business reason for the employment termination. *Snead v. Metropo. Property & Casualty Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). Once a defendant articulates a legitimate reason for the termination, the burden shifts to the plaintiff to show that the reason is a pretext for discrimination. *Id.*

Defendant contends Plaintiff cannot satisfy any of the three elements to establish her prima facie case, and it has articulated a legitimate reason for Plaintiff's termination. Plaintiff disputes the contention that she did not suffer a covered disability and claimed the reason offered for her termination is a pretext for discrimination.

### 1.    Covered Disability

Congress enacted the ADA Amendment Act of 2008 ("ADAAA") to expand "the class of individuals who are entitled to protection under the ADA." *Rohr v. Salt River Project Agric. Improvement and Power Dist.*, 555 F.3d 850, 853 (9th Cir. 2009). The definition of "'disability' was to be broadly construed and coverage will apply to the 'maximum extent' permitted by the ADA and the ADAAA." *Id.* at 861.

The ADA contains three definitions of disability. 42 U.S.C. § 12102(1). Plaintiff is proceeding under the first definition — that she has "a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(1)(A). Under the ADA, "major life activities" cover working as well as "the operation of a major bodily function," which includes endocrine functions. 29 C.F.R. § 1630.2(i)(1)(i)-(ii). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Moreover, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

The Complaint alleges that the "medical procedure [hysterectomy] caused a hormonal imbalance in Plaintiff resulting in mood swings, emotional issues and failure to comprehend and focus all of which substantially limit Plaintiff's daily life activities." (Dkt. no. 1, ¶ 3.) In her response to interrogatories, Plaintiff stated that the hysterectomy "caused a change in her mood balance, an endocrine function, which in turn caused lack of control over emotions, adversely affected Plaintiff's comprehension and ability to interact with others, with extreme mood swings, and caused insomnia with resulting fatigue." (Dkt. no. 24-12 at 4.) She further claims that "[t]his is a chronic condition."[5] (*Id.*) ///

_____

[5]Plaintiff testified that she stopped taking hormone supplements about six months after her termination because they were affecting her mood — making her "emotional" and feel "withdrawn." (Dkt. no. 24-4 at 35-37.) She did not start to feel better until early 2011. (*Id.*)

1    Defendant argues that Plaintiff does not have a disability because the medical

2    evidence does not support her claim that she experienced symptoms of hormonal

3    imbalance. Defendant cites to the evidence that (1) Dr. Beckman only told Plaintiff she

4    "may" have problems after her hysterectomy, (2) he released her to return to work on

5    August 12, 2009, and (3) he told her on October 21, 2009 that her medication "could" be

6    the cause of her problems or that her problems could "possibly" be related to her

7    hysterectomy, but he could not be sure.[6] Defendant contends that one is left to

8    speculate as to what Plaintiff's disability might be since Dr. Beckman determined she

9    did not have any physical disability and Plaintiff only offers her statement as to her

10   emotional instability. Defendant's argument is unavailing.

11   Defendant's proffered evidence does not show that Dr. Beckman found Plaintiff

12   did not experience emotional impairment. In fact, Dr. Beckman adjusted Plaintiff's

13   medication on October 22, 2012, because of Plaintiff's symptoms.[7]  Plaintiff testified that

14   she began to experience mood swings in September, after she had been released to

15   work for several weeks, and her emotional impairment worsened such that by October

16   21, 2009, she had suicidal thoughts and did not believe she should continue to work.

17   Defendant's proffered records from Dr. Beckman do not dispute that Plaintiff

18   experienced these impairment.

19   Plaintiff has offered evidence through her testimony that she has a physical

20   impairment that affects major life activities, including working and the operation of her

21   endocrine system. "At the summary judgment stage, 'precedent does not require

22   comparative or medical evidence to establish a genuine issue of material fact regarding

23   _____

24   [6]Defendant appears to suggest that just because a physician is not certain as to
the reason for the symptoms that a patient experiences, the symptoms themselves
cannot be disabling. This is absurd. Science does what it can, but not all of the
25   mysteries of the human body have been solved. Sometimes a doctor cannot determine
what causes a disabling symptom, but that does not mean the symptom does not exist.

26   [7]Defendant does not and cannot argue that because Plaintiff's mental impairment
could be treated with hormone supplements that she therefore does not have a
27   disability. This is because the ADAAA requires courts to determine disability "without
regard to the ameliorative effects of mitigating measures" such as medication. 29 C.F.R.
28   §§ 1630.2(j)(1)(vi) and 1630.2(j)(5)(i).

the impairment of a major life activity. . . . Rather, . . . a plaintiff's testimony may suffice to establish a genuine issue of material fact.'" *Rohr,* 555 F.3d at 858-59 (quoting *Head v. Glacier Nw. Inc.,* 413 F.3d 1053, 1058 (9th Cir. 2005)). The Court agrees with Plaintiff that her testimony, which is not contradicted by Dr. Beckman's records, is sufficient to create a genuine issue of material fact as to whether she has a covered disability under the ADA.

### 2.    "Qualified" Individual

Defendant next argues that Plaintiff is not a "qualified" individual under the ADA because she admits that she was not able to perform the essential functions of her job. Defendant asserts that the Court must view Plaintiff's ability to perform her essential job duties at the time she requested accommodation, not at a later time.[8]

"An individual is qualified if with or without reasonable accommodation, she can perform the essential functions of the employment position." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) (quoting *Cripe v. City of San Jose,* 261 F.3d 877, 884-85 (9th Cir. 2001).

Defendant cites to Plaintiff's testimony about her mental state before she was taken off work on October 20, 2009, to argue that she admittedly was unable to perform her job duties. Plaintiff did testify that as of the morning of October 21, 2009, she did not believe she would have been able to perform one of the essential functions of her job, which was to be an armed guard. (Dkt. no. 2404 at 45.) However, on that date, Plaintiff was told not to show up for her shift but to report for a Fitness for Duty exam on October 22, 2009. After the exam, Plaintiff was taken off work and was told to consult with her physician and report back to the Clinic. By November 4, 2009, the day after the second

---

[8]Despite this argument, Defendant cites to Plaintiff's testimony that she continued to experience emotional impairment until early 2011.

deadline for Plaintiff to report to the Clinic, Plaintiff was feeling better and she felt the change in her medication had helped her. In fact, Dr. Beckman confirmed that the medication was beginning to work and released her to return to work starting on November 5, 2009. Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, her testimony and Dr. Beckman's release for her to return to work on November 5, 2009, create a genuine issue of material fact as to whether she was qualified, with or without reasonable accommodation, to perform her essential job functions. A reasonable jury may conclude that Plaintiff could perform the essential functions of her job on November 5, 2009, had Defendant accommodated Plaintiff by extending her leave until then.

### 3.  Causation and Plaintiff's Employment Termination

Defendant argues that Plaintiff cannot show that her employment was terminated because of disability. The facts relating to this argument are intertwined with Defendant's cursory claim that it had legitimate, non-pretextual reason for Plaintiff's termination. Because all three arguments rely on Plaintiff's termination, the Court will address these issues collectively. The Court finds that the parties' dispute as to the reason for Plaintiff's employment termination creates a genuine issue of material fact that precludes summary judgment.

Defendant claims Plaintiff's employment was terminated because she did not report to the Clinic after being given the Second Notice to report on or before November 3, 2009. The Second Notice stated: "failed to check in with clinic on 10-26-09. Must check in by 11-3-09 with Dr. note." (Dkt. no. 24-9.) Plaintiff admitted she did not report to the Clinic. However, Plaintiff testified she called the Clinic the day she received the Second Notice and spoke to the clinic administrator, Patty Cohen, to explain that she had not seen her personal doctor yet. (Dkt. no. 25-1 at 20.) Ms. Cohen told her to go to her doctor's appointment and bring the note from her doctor. (Dkt. no. 24-4 at 62.)

///

///

According to Plaintiff, Ms. Cohen told her "[d]on't worry about that date."[9] (*Id.*; dkt. no. 25-1 at 19.) She testified that based on this conversation, she did not report to the Clinic but went to her doctor's appointment on November 4, 2009, and then contacted the Clinic after this appointment. Defendant argues that Plaintiff twice received notice that she must report to the Clinic, but she failed to report as instructed in violation of its "no call, no show" policy. Plaintiff's testimony shows she thought she complied with the Second Notice by contacting the Clinic and was told not to worry about the deadline since she had not seen Dr. Beckman yet to be able to provide the Clinic with the required note from him. Defendant also offered termination letters sent to other employees who violated its "no call, no show" policy. (Dkt. no. 24-10.) One of these letters, the letter dated July 28, 2009,[10] suggests that Defendant made more attempts to contact the employee who missed a Clinic appointment than merely sending a second notice. (*Id.* at 5 (letter states in part: "We have made several attempts to contact you regarding your missed appointments. All attempts have been unsuccessful.") In Plaintiff's case, she did not physically report to the Clinic, but she did contact the clinic administrator. Under these circumstances, a reasonable jury may find that Plaintiff did comply with the Second Notice and Defendant's reason for terminating her employment is a pretext.

### B.   Retaliation

In response to the Motion, Plaintiff contends that she also asserts a claim for retaliation, citing to the allegation that she was terminated for exercising her rights under the ADA. The Court agrees with Defendant that the Complaint fails to allege a claim for retaliation.

///

---

[9]Plaintiff testified that Ms. Cohen instructed her not to report to the Clinic, but after further examination, she admitted that Ms. Cohen did not specifically say: "Don't show up." (Dkt. no. 25-1 at 19; dkt. no. 24-4 at 62.) Plaintiff testified that Ms. Cohen did say: "Don't worry about that date [November 3, 2009]." (Dkt. no. 24-4 at 62.)

[10]It is not clear whether the letter was sent in 2009 or 2007 because of the conflicting years in the letter. (Dkt. no. 24-10 at 5.)

Fed. R. Civ. P. 8's notice pleading standard requires a plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 555).

The Complaint asserts a single claim for relief under the heading "First Claim for Relief." The paragraphs under this heading allege disability discrimination. The allegation that Plaintiff relies on is embedded in a paragraph where she alleges disability discrimination based on her termination and Defendant's failure to provide reasonable accommodation. (*See* dkt. no. 1, ¶ 18.) Plaintiff's Complaint does not include any reference to retaliation, let alone detailed factual allegations to support this claim. Plaintiff fails to give fair notice to satisfy Rule 8's requirement that she is also asserting a separate claim for retaliation.[11] Plaintiff cannot now seek to expand her Complaint to assert a retaliation claim.

## V.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Defendant's Motion for Summary Judgment (dkt. no. 24) is denied.

DATED THIS 20th day of March 2015.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[11]The Court need not address Plaintiff's argument that she properly exhausted her administrative remedies as to her retaliation claim. However, the fact that she did not allege retaliation in her U.S. Equal Employment Opportunity Commission ("EEOC") charge further underscores the need for her Complaint to give fair notice to Defendant that she is seeking to assert a claim that was not raised before the EEOC.